# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| **FRANK L. GREENWOOD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 05 C 5707** |
| | ) | |
| **v.** | ) | **Magistrate Judge Morton Denlow** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## MEMORANDUM OPINION AND ORDER

This case comes before this Court on Plaintiff's motion for summary judgment and Defendant's motion for summary judgment. Plaintiff, Frank L. Greenwood ("Plaintiff" or "Claimant"), challenges the decision of Defendant Jo Anne B. Barnhart, Commissioner of Social Security ("Defendant" or "Commissioner"), claiming that her denial of Plaintiff's request for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") should be reversed or remanded because the Administrative Law Judge: (1) failed to follow SSR 96-8p and his RFC finding is not supported by substantial evidence; (2) improperly found that the Claimant was not credible; (3) posed incomplete hypotheticals to the VE and thus substantial evidence does not support the ALJ's step five finding; (4) improperly relied on the VE's testimony that conflicts with the Dictionary of Occupational Titles; and (5) made a RFC finding that conflicts with SSR 83-10 and the VE's testimony regarding available jobs was improper. For the reasons stated below, this Court grants

Claimant's motion for summary judgment and denies the Commissioner's motion for summary judgment.

## I. BACKGROUND FACTS

### A.  PROCEDURAL HISTORY

Claimant filed applications for DIB and SSI on March 12, 2002, alleging a disability since January 1, 2002 on account of not being able to use his right hand effectively.  R. 70, 84.  The applications were denied initially, R. 28, and again upon reconsideration.  R. 38. On April 16, 2004, Administrative Law Judge Edward R. Gustafson ("ALJ") held a hearing on the question of disability. R. 250-83.  Claimant, who was represented by counsel, testified at the hearing.  R. 252-55, 257-73, 281-82.  Dr. Daniel Girzadas, a medical expert , R. 254-57, 259, 273-79, 281-82, and Dr. Richard Hamersma, a vocational expert, R. 278-81, also testified.

On May 27, 2004, the ALJ issued his decision, and determined that Claimant was not disabled.  R. 18-27.  On August 5, 2005, the Appeals Council denied Claimant's request for review.  R. 7-9.

Claimant now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g).  The parties have consented to this Court's jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c)(1).  The Court conducted an oral argument on May 15, 2006.

### B.  HEARING TESTIMONY - APRIL 16, 2004

### 1.    Claimant's Testimony

Claimant was 46 years old at the date of the hearing.  R. 252.  He has lived in a third-floor apartment for approximately three years.  R.252-53.  Claimant has a General Education Development (GED) degree.  R. 253.  In his last job, where he was employed for about two years, Claimant installed automotive accessories such as brush guards, side bars, and car radios.  *Id.*

Claimant testified that he broke his thumb when he fell off his bicycle.  R. 253, 258. He said he dislocated his thumb, the bone came through the skin, a cast was put on it, and it became infected causing Claimant to be hospitalized for three or four days.  R. 267. Antibiotics cleared up the infection.  R. 270.  He said no stitches were applied to his thumb, and he put his thumb back in place; thus the emergency room treaters did not know if he had a dislocation.  R. 269-70.

Claimant stated that he could not really use his thumb, "it doesn't bend or anything, [i]t hurts constantly ... [and he] can't lift anything with it."  R. 258.  Claimant said he could not turn on a showerhead or grab anything with his right hand; he was limited to his left hand. R. 259.  He can lift "[s]ome light things," such as a shirt or pair of pants, but nothing that he really has to "grip ... because it'll slip out."  R. 266.  He can lift maybe five or six pounds with his right hand.  *Id.*  He uses his left hand for his cane, and must do all of his lifting with his right hand when he is standing with the cane.  *Id.*  Claimant also testified that his problem was that he could not bend the last joint in his thumb; the rest of the thumb was okay and he could bend it.  R. 271.  There was no medical information in the record since

2002.  R. 281.  Claimant represented that he was scheduled for an appointment on April 27. *Id.*  Although the ALJ left the record open for 30 days to supplement the thumb portion of the record, nothing was submitted.  R. 282.

Claimant also injured his ankle and knee when he was hit by a car and pinned between a van and a car.  R. 254, 267.  He stated that his injuries have "healed some.  [He is] still under a doctor's care.  [The doctor] may have to perform surgery [on his knee].  [The doctor] said he may have to fuse a bone or something and put some rods and screws in there."  *Id.*  Claimant used a cane at the hearing.  R. 259.  His knee has been swollen since the accident, and no one has taken any fluid out of his knee.  R. 271.  He received a shot on the side of his knee, and no one suggested that he undergo an MRI.  R. 271-72.  Claimant stated that even though the x-rays indicate the fracture is completely healed, he always uses his cane because his leg gives out sometimes.  R. 273.

Claimant was also given a knee brace by his doctor, and he daily takes Tylenol III with codein, Motrin, and Bextra.  R. 259-60.  The medications make Claimant dizzy about 13 or 14 days a month, and he must lay down for 3 or 4 hours when the dizziness occurs.  R. 260-61.  The dizziness has occurred on and off for just over a year.  R. 261.

His ankle sometimes swells, but it does not bother him as much as his left leg.  R. 265. His left leg hurts everyday and the pain is typically a three or four out of ten, though it sometimes can be a seven or eight.  *Id.*  When the pain gets intense, he takes medicine and has to lay down until the medicine works.  *Id.*  Sometimes it takes an hour for the medicine to work, and other times he may be in bed for the day.  *Id.*

A typical day for Claimant is as follows: Claimant wakes up around 5:30 or 6:00, uses the bathroom, then sits in the tub and soaks his leg for 35 or 40 minutes. R. 262-63. He then puts his knee brace on, reads a book or watches television, and spends most of the day sitting down or laying down. R. 263. He cannot shop; his cousin does it for him. R. 262. He cannot shower because his leg sometimes gives out. *Id.* He sits with his leg straightened out; he can only sit with his knee at a 90-degree angle for about an hour. *Id.* He can only stand for approximately twenty minutes and then he must sit for some time between twenty minutes and an hour. R. 263-64. He also testified that the dizziness caused by the medication affects his ability to read. R. 263. Claimant has no difficulties sitting for long periods of time so long as he has room to keep his leg stretched out straight. R. 264. He can only walk about two blocks at one time, and it takes him about twenty minutes to get up the stairs to his third-floor apartment. *Id.*

## 2. Dr. Daniel Girzadas - Medical Expert ("ME")

Dr. Daniel Girzadas, an orthopedic specialist, testified as a medical expert at the hearing regarding Claimant's medical impairments and pain allegations. R. 252, 254-57, 259, 273-79, 281-82. The ME highlighted a note from Mount Sinai Medical Center, which stated that Plaintiff had mild degenerative changes at the proximal tibia fibular joint and that options had been discussed with Plaintiff for a possible fusion of the joint. R. 255.

Regarding the fusion procedure, the ME stated that he "went through a computer search, and the major orthopedic textbooks, and conferenced with three orthopedic surgeons, and no one's ever heard of a fusion of the proximal tibia fibular joint." R. 255. He said,

"That's an operation that we [have not] heard of, and we can't find on the Internet." R. 256.

Asked why it is not a feasible operation, the ME replied,

> Well, it's not a true joint. It's a syndesmosis.[1] In other words, it's a point at which the fibula and tibia come together and there's virtually no motion there. In fact, you can take that piece of bone and not miss it, and there's no reason to have an operation where you fuse it to the tibia. I mean it's a disposable part, if you might say, that does not have a function when you walk or you do any kind of motion, and if you take it out, the lateral collateral ligament can attach to the tibia without any difficulty. The next report in the literature – in the record there's an x-ray report ... which does not note any arthritis in that joint.

R. 256. The ME also testified that the x-ray report shows that Claimant's left knee joint has an effusion[2] and he has a healed fracture of the proximal tibia. *Id.* Therefore, the ME stated that "there might be something that's going on in his knee that's not been diagnosed, but there's nothing that's reported on the x-ray concerning the proximal tibia or the fibula." *Id.*

The ME testified that, according to the x-rays, Claimant's leg was in good alignment, it was completely healed, and there should be no impediment with reference to the tibia. R. 257. Regarding the malleolus[3], the ME stated that there was a small, chip fracture, but the cast was removed in four weeks and Claimant was full weight-bearing thereafter. *Id.* The ME saw no reason why Claimant could not perform light work. *Id.*

---

[1] A form of fibrous joint in which opposing surfaces that are relatively far apart are united by ligaments. *Steadman's Medical Dictionary* 1721 (26th ed. 1995).

[2] The escape of fluid from the blood vessels or lymphatics into the tissues or a cavity. *Steadman's Medical Dictionary* 547 (26th ed. 1995).

[3] A rounded bony prominence, such as those on either side of the ankle joint. *Steadman's Medical Dictionary* 1057 (26th ed. 1995).

The ME discussed multiple injuries to Claimant's thumb and legs that are supported by the record. R. 273-74. He observed that while the fractures to Claimant's tibia, fibula, and thumb have healed, Claimant has a residual of swelling of his knee. R. 274-75. Regarding the swelling, the ME stated that it is possible that when Claimant broke his tibia, he may have sustained cartilage damage or meniscus damage in his knee, which would account for his knee giving way and the continued swelling. R. 276. However, the ME said Claimant has had no diagnostic studies and there is no objective medical information to explain the knee problem. *Id.* The ME also stated that the swelling of his knee, or joint effusion, since the date of his injury would limit his ability to walk and stand to at least two hours a day. R. 276-77.

Finally, the ME testified that it is possible that Claimant could have residual limitation of motion in his thumb, even though he had no evidence to substantiate such a limitation. R. 276. Based on the record, the ME opined that Claimant could use his right hand for handling and fingering for one-third to two-thirds of the day. R. 277. The ME also stated, however, that from his standpoint, there should not be pain in Claimant's thumb. R. 282.

### 3.    Dr. Richard Hamersma - Vocational Expert ("VE")

Dr. Richard Hamersma, a VE, testified at the hearing regarding existing jobs in the economy which might be suitable for Claimant. R. 278-281. In response to the ALJ's hypothetical question about an individual with Claimant's age , vocational background, and a hand injury that limited his hand dexterity to fine dexterity for two-thirds of the day and without fine dexterity for the rest of the day, the VE testified that it would have an effect on

his ability to do light work. R. 278. Specifically, such limitations "would probably eliminate, just in terms of dexterity, maybe 1/3 of the jobs." *Id.* The VE opined that Claimant could perform the following light and unskilled jobs: inspector (6,500 jobs in the Chicago metropolitan area), hand packager (7,000 jobs), and assembly worker (8,000 jobs). R. 278-79. The VE then said that even if you added to the above hypothetical individual a knee injury that limits him from walking and standing in excess of two hours a day, the jobs and numbers listed above would not be affected because those jobs can be performed with a sit/stand option. R. 279. The VE further testified that the hypothetical only applied to limitations to fine dexterity, but jobs affected by limitations to gross manipulation were not included in the hypothetical. R. 280-81.

## C.      MEDICAL EVIDENCE - PHYSICAL HEALTH

### 1.      Cook County Hospital - June 2001 - March 2002

On June 22, 2001, Claimant sought emergency treatment at Cook County Hospital for an injury sustained to his thumb after falling off his bike. R. 174-75. He dislocated his thumb and was prescribed antibiotics for an infection. *Id.* Claimant was diagnosed with a right thumb infection at an examination on July 12, 2001, and prescribed Heflex and Tylenol. R. 148. X-rays taken on March 8, 2002 diagnosed Claimant with right thumb arthritis. R. 142-48. On the "Return to Work/School Verification" form completed on March, 8 2002, the physician indicated that Claimant could resume work the following day, but Claimant was restricted to working with only his left hand until he had surgery in April 2002. R. 147.

### 2.      Dr. Scott Kale - Consultative Examination - March 20, 2002

On March 20, 2002, Dr. Scott Kale ("Dr. Kale") performed an internal medicine consultative examination on Claimant. R. 139-41. Regarding Claimant's musculoskeletal system, Dr. Kale reported:

> Straight leg raising is negative. Range of motion of the shoulders, elbows and wrists is normal. The right hand grip strength is 3/5 power verses 5/5 power in the left. There is moderate tenderness over the first carpal metacarpal joint of the right thumb. He has lack of flexion at the DIP of the right thumb. The range of motion of the hips, knees and ankles is normal. The gait was non-antalgic without the use of an assistive device.

R. 140-41. Dr. Kale's clinical impression was that Claimant had "[c]hronic tendonitis secondary to fracture of the right thumb with altered grip strength and right hand use for fine and gross manipulation." R. 141.

### 3.    Dr. Prahlad Pyati - Mount Sinai Hospital - June 2002 - March 2004

On June 8, 2002, after being pinned between a van and a car in an automobile accident, Claimant was admitted into Mount Sinai Hospital and treated by Dr. Prahlad Pyati ("Dr. Pyati"). R. 169. Claimant suffered a comminuted fracture of the shaft, proximal part of the left tibia and a crack fracture of the lateral malleolus on the right ankle. *Id.* To treat the fractures, Claimant received an external fixator[4] and a short-leg walking cast. *Id.* The operative report noted that Claimant "tolerated the procedure well." *Id.* Dr. Pyati also reported that Claimant's left knee demonstrated a large suprapatellar fluid collection, which was most likely blood associated with the comminuted fracture of the proximal tibia, but no

---

[4] A device providing rigid immobilization through external skeletal fixation by means of rods attached to pins which are placed in or through the bone. *Steadman's Medical Dictionary* 660 (26th ed. 1995).

other noteworthy finding could be made." R. 171.

Treatment records from July 18, 2002, indicated that Claimant was "doing well," but x-rays of the tibial shaft showed that the fracture was healing slowly. R. 157. The fracture of the right ankle was healed. *Id.* The cast on the right leg was removed and an air cast was applied. *Id.* Claimant was referred to physical therapy for range of motion exercises for the right ankle and the left knee. *Id.*

On September 26, 2002, following Claimant's physical therapy, x-rays showed that Claimant's fracture of the proximal tibia was completely healed. R. 236. Dr. Pyati attempted to remove the external fixator, but the procedure was aborted, and the fixator reapplied, because Claimant could not stand the pain. *Id.* On October 4, 2002, with Claimant under general anesthesia, the leg was cleaned and the external fixator was removed without difficulty. R. 235. Clean dressings were applied and Claimant tolerated the procedure well. *Id.* On October 14, 2002, x-rays were taken and they showed that the fracture had completely healed. R. 234. However, Claimant still had some quadriceps weakness. *Id.* Therefore, he was referred to physical therapy to strengthen his quadriceps. *Id.* He was still wearing a Don Joy brace. *Id.*

On January 23, 2003, Dr. Pyati took more x-rays and stated that the x-rays showed a completely healed fracture of the tibia. R. 233. However, Claimant still complained of pain in his right ankle, which also had been fractured. *Id.* Dr. Pyati took x-rays of the right ankle and the x-rays showed a completely healed fracture of the lateral malleolus with no evidence of any non-union. *Id.* Dr. Pyati noted that Claimant "was reassured about this." *Id.*

Claimant still had some weakness in his left quadriceps, and he was advised to do some strengthening exercises. *Id.* Finally, Dr. Pyati noted that Claimant wanted to be discharged, and he had done well and was walking well, he was discharged. *Id.*

Dr. Pyati saw Claimant again on February 19, 2004. R. 231. Claimant came complaining of pain in the left proximal leg area and said the pain radiates along the lateral aspect of his leg. *Id.* Dr. Pyati reported that clinically, there was definite tenderness over the proximal tibial fibular joint, but the rest of the joint was normal. *Id.* X-rays taken showed some evidence of degenerative joint disease changes from the proximal tibial fibular joint. *Id.* Dr. Piyati instilled the joint with a mixture of 40 mg of Depo-Medrol and Xylocaine with good relief. *Id.* If the injection did not alleviate the pain, Dr. Piyati noted that she might have to fuse the joint, though she was not sure Claimant warranted such a procedure. *Id.*

On March 18, 2004, Claimant followed up with Dr. Pyati and Dr. Pyati reported that the February 19th injection helped Claimant for about two weeks. R. 229. The examination showed that there was still tenderness over the proximal tibial fibular joint, which showed mild degenerative joint disease changes. *Id.* Dr. Pyati reported that options were discussed with Claimant for possible fusion of the joint, but Claimant was not very anxious for that procedure. *Id.* Claimant wanted to have some disability forms filled out and was scheduled to be seen again in one month. *Id.*

**4.     Schwab Rehabilitation Hospital and Care Network - July 2002 - September 2002**

Between July 22, 2002, and September 24, 2002, Claimant underwent physical therapy at the Schwab Rehabilitation Hospital and Care Network. R. 214-26. Claimant attended fifteen visits and made progress in increasing his strength and range of motion. *Id.* Upon discharge on September 24, 2002, Claimant was independent in community ambulation with a straight cane and had an improved heel toe gait pattern, but he still had a noticeable limp. R. 214. The limp was mostly due to Claimant's tendency to abduct his left leg when he walked to avoid the tip of the external fixator poking the medial aspect of his right knee. *Id.* The discharge assessment noted that Claimant met the goals of treatment set at the initial evaluation, with the exception that there was still a five degrees extension lag in his left knee extension. R. 215.

### 5. Dr. Lisa Russell - Mount Sinai Hospital - April 7, 2004

On April 7, 2004, Claimant sought treatment from Dr. Lisa Russell ("Dr. Russell") because he was concerned he may have had osteomyelitis[5] in his left leg. R. 180. Dr. Russell's history and exam suggested that Claimant did not have osteomyelitis. *Id.* Lab work was ordered and Bextra, an anti-inflammatory medication, was prescribed. *Id.*

## D. THE ALJ'S DECISION - MAY 27, 2004

After conducting the hearing and reviewing the evidence, the ALJ found that Claimant was not disabled within the meaning of the Social Security Act. R. 18-27. Although he determined that Claimant had fractures of the lower limbs and right hand complaints that were "severe" and he could not perform any past relevant work, the ALJ found that Claimant had the residual functional capacity ("RFC") to perform a limited range of light level work. R. 26.

The ALJ assessed Claimant's applications for DIB and SSI under the five-step sequential analysis. *See infra*, Part II B (describing the disability standard of review). Under step one of the disability analysis, the ALJ found that Claimant did not engage in any substantial gainful activity since his alleged onset date. R. 25-26.

Under the second step, the ALJ found that Claimant had fractures of the lower limbs and right complaints that were severe impairments. R. 26. At step three, however, the ALJ determined that Claimant's severe impairments did not meet or equal a listed impairment

---

[5] Inflammation of the bone marrow and adjacent bone. *Steadman's Medical Dictionary* 1269 (26th ed. 1995).

under the Social Security Regulations. *Id.*

At step four, the ALJ determined Claimant's RFC. The ALJ stated that even giving Claimant the benefit of the doubt as to his pain allegations, "the record lacks sufficient documentation to show that he suffers from significant functional limitations that preclude his capacity to sustain gainful employment." R. 24. In particular, the ALJ noted that "the record does not contain any opinions from treating or examining physicians indicating that [C]laimant is disabled, or even remotely has limitations that would preclude employment." *Id.* The ALJ also "considered [C]laimant's subjective complaints, as compared to objective medical findings." *Id.* The ALJ found that "[o]verall, [C]laimant's reported [limitations in his] daily activities are considered to be outweighed by the other factors discussed in this decision." The ALJ found that Claimant's alleged limitations were not totally credible. R. 26. Therefore, the ALJ determined that Claimant possessed the RFC to perform a limited range of light work. R. 25-26. The ALJ found that such limitations included performing fine dexterity for only two-thirds of the day and a reduced ability to stand or walk for only two hours in an 8-hour workday. R. 26.

Under step five, the ALJ determined that based upon his RFC, Claimant could not perform any past relevant work. R. 25-26. However, in light of the VE's testimony, the ALJ concluded that notwithstanding Claimant's exertional limitations preventing him from performing the full range of light work, there were a significant number of jobs he could perform. R. 26. Namely, there were 8,000 inspector positions, 7,000 hand packager jobs, and 8,000 assembly line positions. R. 25-26. Therefore, the ALJ concluded that Claimant

is not disabled.  R. 25-26.

## II.  LEGAL STANDARDS

### A.    STANDARD OF REVIEW

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."  42 U.S.C. § 405(g).  A decision by an administrative law judge, ("ALJ"), becomes the Commissioner's final decision if the Appeals Council denies a request for review.  *Wolfe v. Shalala,* 997 F.2d 321, 322 (7th Cir. 1993)**.** Under such circumstances, the decision reviewed by the district court is the decision of the ALJ.  *Eads v. Sec'y of the Dep't of Health & Human Servs.*, 983 F.2d 815, 816 (7th Cir. 1993).  Judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching his decision and whether there is substantial evidence in the record to support the findings.  *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971).  A mere scintilla of evidence is not enough.  *Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995).  Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand.  *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

While a reviewing court must conduct a "critical review" of the evidence before

affirming the Commissioner's decision, *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000), it may not re-evaluate the facts, re-weigh the evidence, or substitute its own judgment for that of the Social Security Administration. *Diaz,* 55 F.3d at 305-06. Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching a decision and whether there is substantial evidence to support the findings. *Scivally v. Sullivan,* 966 F.2d 1070, 1075 (7th Cir. 1991)**.** The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## B.    DISABILITY STANDARD

Disability insurance benefits, ("DIB"), are available to claimants who can establish "disability" under the terms of Title II of the Social Security Act, ("Title II"). *Brewer v. Charter*, 103 F.3d 1384, 1390 (7th Cir. 1997). Supplemental Security Income benefits, ("SSI"), are available to "disabled indigent persons" under Title XVI of the Social Security Act, ("Title XVI"). *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). Titles II and XVI of the Social Security Act employ the same definition of "disability." *Id.* That is, an individual is "disabled" if that individual has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). However, a disabled individual is eligible for DIB only if that individual is under a disability. 42 U.S.C. §§ 423(a); 1382c(a). An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education,

and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To make this determination, the Commissioner must employ a five step sequential analysis. 20 C.F.R. §§ 404.1520(a)-(f); 416.920(a)-(f). If the ALJ finds at any step of this process that a claimant is not disabled, the inquiry ends. *Ismahel v. Barnhart,* 212 F. Supp. 2d 865, 872 (N.D. Ill. 2002). The process is sequential; if the ALJ finds that the claimant is not disabled at any step in the process, the analysis ends. Under this process, the ALJ must inquire: (1) whether the claimant is still working; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) if the claimant does not suffer from a listed impairment, whether he can perform past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *Id.*

## III. DISCUSSION

Claimant raises five issues for review: (1) whether the ALJ followed SSR 96-8p and his RFC finding is supported by substantial evidence; (2) whether the ALJ properly found that the Claimant was not credible; (3) whether the hypotheticals posed to the VE by the ALJ were incomplete and thus substantial evidence does not support the ALJ's step five finding; (4) whether the ALJ improperly relied on the VE's testimony that conflicts with the Dictionary of Occupational Titles; and (5) whether the ALJ's RFC finding conflicts with SSR 83-10 and whether the VE's testimony regarding available jobs was improper. The Court will discuss each issue in turn.

**A.     THE ALJ'S RFC FINDING IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND HE DID NOT PROPERLY FOLLOW SSR 96-8P.**

RFC is an administrative assessment of what work-related activities an individual can perform notwithstanding his limitations. *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); SSR 96-8p. When determining the claimant's RFC, the ALJ must consider both the medical and non-medical evidence in the record. *Dixon*, 270 F.3d at 1178. "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts ... and nonmedical evidence ... In assessing RFC, the [ALJ] must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule) ... The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p (citations omitted).

Although an ALJ need not discuss every piece of evidence in a claimant's record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995). This is necessary so that a reviewing court can tell whether the ALJ's decision rests upon substantial evidence. *Golembiewski*, 55 F.3d at 307. However, the ALJ must only minimally articulate his assessment of this line of evidence. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004). After all, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the

ALJ has done enough." *Id.*

In this case, the ALJ misstated the ME's opinion and failed to explain the discrepancy. While the ALJ thoroughly discussed Claimant's medical evidence[6] and explicitly found that "[C]laimant retains the residual functional capacity [RFC] to perform a limited range of light level work," the ALJ's RFC finding is erroneous because he did not accurately incorporate the ME's opinion into his RFC, and thus the ALJ's RFC finding is not supported by substantial evidence.

The ALJ discussed the ME's testimony in his decision. The ALJ wrote that "[a]lthough there is no objective evidence of a thumb problem, the orthopedist expert present at the hearing, Dr. Girzadas [the ME], reduced [C]laimant's [RFC] allowing fine dexterity only 2/3 of a day. Additionally, because of knee swelling, [the ME] reduced walking and standing to 2 hours." R. 25. Then, in his RFC determination, the ALJ appears to adopt the

---

[6] The ALJ stated that the "record reflects that the [knee] surgery was generally successful in relieving his symptoms." R. 24. Next, the ALJ noted that "x-rays, subsequent to surgery, showed completely healed fractures." *Id.* (citations omitted). Thus, the ALJ wrote that "[e]ven giving [C]laimant the benefit of the doubt as to mild residuals of pain resulting from his alleged impairments, the record lacks sufficient documentation to show that he suffers from significant functional limitations that preclude his capacity to sustain gainful employment." R. 24. Furthermore, the ALJ pointed out that "the record does not contain any opinions from treating or examining physicians indicating that [C]laimant is disabled, or even remotely has limitations that would preclude employment." *Id.* The ALJ further stated that Claimant's "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if [C]laimant's are truly as limited as alleged, it is difficult to attribute that degree of limitation to his medical condition, as opposed to other reasons, because the preponderance of the objective medical record lacks sufficient documentation in support of such limitations." *Id.*

ME's opinion and recite it as his RFC finding.  R. 26.  However, the ME's testimony differs from the ALJ's representation of it.

Regarding Claimant's hand limitations, the ME opined that "his *handling and fingering* would be occasional on the right hand ... [b]etween *1/3 and 2/3* of the day."  R. 277 (emphasis added).  The ALJ, however, stated that the ME "reduced [C]laimant's [RFC] allowing fine dexterity only 2/3 of a day."  R. 25.  Then, in his RFC finding, the ALJ stated that Claimant could perform a limited range of light level work and "[h]e is limited to performing fine dexterity for only 2/3 of the day, and his walking and standing abilities are reduced to 2 hours in an 8-hour workday."  The ALJ failed to include the ME's opinion regarding Claimant's reduced "handling" abilities, and the ALJ did not include the ME's opinion that Claimant's dexterity might only be functional for 1/3 of the day.

"Handling" is "gross manipulation" and "fingering" is "fine dexterity."  *See Medina v. Barnhart*, No. 03 Civ. 0079, 2004 WL 487310, at *3 (S.D.N.Y. Mar. 11, 2004) ("Finally, he indicated that she could occasionally use her hands for repetitive actions such as handling (gross manipulation), fingering (fine manipulation), and pushing and pulling."); *see also Carson v. Barnhart*, 242 F.Supp.2d 33, 38 (D. Me. 2002) (stating that handling is gross manipulation).  The *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* defines "handling" as "[s]eizing, holding, grasping, turning, or otherwise working with hand or hands.  Fingers are involved only to the extent that they are an extension of the hand, such as to turn a switch or shift automobile gears."  SCODICOT APP C.9.  It defines "fingering" as "[p]icking, pinching, or otherwise working

primarily with fingers rather than with the whole hand or arm as in handling." *Id.* at C.10. Handling and fingering do not both fall under the category of "fine dexterity." Therefore, the ALJ failed to take into account the ME's opinion that Claimant's gross manipulation as well as his fine dexterity would be occasional. The ALJ also failed to consider that Claimant's limitations might exist for between 1/3 and 2/3 of the day.

SSR 96-8p states that "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Thus, even if the ALJ chose not to follow the ME's opinion, he would have to explain why he was rejecting it. "[T]he ALJ is precluded from substituting his own judgement for that of the medical expert." *Hampton v. Massanari*, 171 F.Supp.2d 791, 795-96 (N.D. Ill. 2001) (citing *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996)). Here, however, it appears that the ALJ simply misstated the ME's opinion[7] and then relied on that erroneous statement in his RFC finding. Therefore, the ALJ's RFC finding is flawed and not supported by substantial evidence.

**B.      THE ALJ ERRED BY POSING AN INCOMPLETE HYPOTHETICAL TO THE VE**

Claimant argues that the ALJ's step five finding was not supported by substantial evidence because the hypotheticals posed to the VE were incomplete. Defendant disagrees

---

[7] The ALJ also misrepresented some of the VE's testimony in his decision. The VE testified that there were 6,500 inspector jobs available in the Chicago metropolitan area. R. 279. In his decision, however, the ALJ stated that the VE testified that there were 8,000 inspector jobs. R. 25.

and argues that the hypotheticals asked to the VE incorporated all of the record evidence.

When posing a hypothetical question to the VE, the ALJ "must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record." *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994). The hypothetical must also include "all limitations supported by medical evidence in the record." *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). However, an exception "exists for cases in which the [VE] independently learned of the limitations (through other questioning at the hearing or outside review of the medical records, for example) and presumably accounted for them." *Id.*

In this case, regarding Claimant's hand limitations, the ME testified that "his handling and fingering would be occasional on the right hand ... [b]etween 1/3 and 2/3 of the day." R. 277. Then, in the ALJ's first hypothetical to the VE, the ALJ asked the VE to assume an individual limited to fine dexterity "2/3 of the day," not between 1/3 and 2/3 as the ME stated, and without the fine dexterity for the other 1/3 of the day. R. 278. The VE said such a limitation would eliminate 1/3 of the jobs available. *Id.* Next, Claimant's attorney tried to clarify the hypothetical for the VE by asking, "if we changed your hypothetical to include [the ME] [so that] his difficulties in bimanual manipulation/fingering would be 1/3 to 2/3 of the day ... you're including that in the hypothetical?" R. 280. The VE answered, "Yes ... the [ALJ] was asking me the total number of jobs giving this. I would say ... this ... at the light level would probably eliminate [one] third of those jobs." *Id.* The VE continued, "This hypothetical only applied to fine dexterity. The [job] numbers I gave do not apply to fine

objects. It's just gross manipulation, which was not limited." R. 280-81. The ALJ then tried to clarify, "In other words, the hand - - the inspection jobs, the hand packaging jobs, the assembly jobs only require gross dexterity?" R. 281. The VE answered, "Yes."

In the instant case, the ALJ failed to pose a hypothetical to the VE that incorporated Claimant's limitations with gross manipulation. The ME opined that Claimant's "handling and fingering" would be occasional for 1/3 to 2/3 of the day. While Claimant's attorney clarified the temporal aspect of the limitation, no one constrained the hypothetical to limitations with both gross manipulation and fine dexterity. As explained in detail in Part III.A. above, "handling" is "gross manipulation" and "fingering" is "fine dexterity." As expressly stated by the VE, his testimony about available jobs for Claimant dealt only with his fine dexterity limitation, not with his gross manipulation limitation. Therefore, the ALJ erred by posing an incomplete hypothetical to the VE, and because the VE expressly stated that his answers did not take into account gross manipulation, the exception for a VE's independent ascertainment of all limitations does not apply.

At oral argument, the Commissioner submitted a section of the DOT to the Court and argued that even if the ALJ's hypothetical was incomplete, it was harmless error because gross manipulation and fine dexterity are required for only 1/3 to 2/3 of the day for the jobs recommended by the VE. However, in light of the numerous components that factor into each occupation under the DOT, the fact that Claimant also has walking and standing limitations in addition to his hand limitations, and the reality that occupational availability is the VE's expertise and not the Court's, the Court finds that the case should be remanded

23

so a VE can properly opine, based on an accurate representation of Claimant's limitations, what jobs, if any, are available for Claimant in the national economy.

## C.   THE ALJ PROPERLY FOUND CLAIMANT NOT TOTALLY CREDIBLE

Claimant next argues that the ALJ made an improper credibility finding and disregarded SSR 96-7p and 20 C.F.R.§ 404.1529 when he found Claimant's testimony "not totally credible." R. 26. Claimant asserts that the ALJ failed to give specific reasons supported by the evidence in the record for his credibility finding, but instead he merely stated that Claimant's reported daily activities were "considered to be outweighed by the other factors discussed in the decision." R. 24. Defendant argues that the ALJ engaged in a thorough analysis of Claimant's credibility and cited several pertinent factors as the basis for his finding.

The ALJ is afforded special deference in his credibility determinations because he is in the best position to see and hear the claimant and assess her forthrightness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Therefore, an ALJ's credibility determination will only be reversed if the claimant can show it was "patently wrong." *Id.* Pursuant to SSR 96-7p, however, the ALJ must give specific reasons for his credibility finding and cannot merely make a conclusory statement that the claimant's allegations have been considered and they are or are not credible. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Thus, the ALJ's credibility determination will be affirmed "as long as the ALJ gives specific reasons that are supported by the record for his finding." *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004).

In *Skarbek*, the ALJ determined that the claimant was not credible regarding his limitations. 390 F.3d at 505. The ALJ gave only two reasons for his findings.[8] *Id.* The Seventh Circuit, however, found that the ALJ complied with SSR 96-7p's requirement that he give specific reasons for his findings even he though he only provided two reasons. *Id.*

In this case, the ALJ gave several reasons and provided sufficient support for his credibility finding. First, the ALJ noted that he "acknowledge[d] the fact that [C]laimant has experienced some pain residuals with regard to his knee and thumb complaints. In fact, the evidence does show that [C]laimant did undergo surgery for his knee impairment - which certainly suggests that his symptoms are genuine." R. 24. However, the ALJ then stated, "while that fact would normally weigh in [C]laimant's favor, it is offset by the fact that the record reflects that the surgery was generally successful in relieving his symptoms." *Id.* Next, the ALJ describes how Claimant completed the recommended fifteen physical therapy visits and examiners reported that except for a five-degree extension lag in his left knee extension, Claimant met the treatment goals set forth at the initial evaluation. *Id.* In addition, the ALJ noted that x-rays taken after Claimant's surgery showed completely healed fractures. *Id.*

---

[8] "First, the ALJ stated that Skarbek's testimony of constant throbbing pain was not consistent with the findings of the specialists or with Skarbek's medical records. Second, the ALJ stated that Skarbek's testimony regarding his daily activities--that, among other things, he drove, did laundry and household chores, and was able to cut grass on occasion--did not support a finding that he was totally disabled. The ALJ found that Skarbek's abilities and activities were more consistent with the opinions of Dr. Yergler and Dr. Graham than with his own testimony." *Skarbek*, 390 F.3d at 505.

Furthermore, the ALJ expressly stated that "[e]ven giving [C]laimant the benefit of the doubt as to mild residuals of pain resulting from his alleged impairments, the record lacks sufficient documentation to show that he suffers from significant functional limitations that preclude his capacity to sustain gainful employment." R. 24. The ALJ also noted that "the record does not contain any opinions from treating or examining physicians indicating that [C]laimant is disabled, or even remotely has limitations that would preclude employment." *Id.*

Next, the ALJ set forth the myriad limitations Claimant alleged due to his pain and weakness, and the ALJ stated that he had "considered [C]laimant's subjective complaints, as compared to objective medical findings." *Id.* The ALJ then stated:

> Although [C]laimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding him disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if [C]laimant's are truly as limited as alleged, it is difficult to attribute that degree of limitation to his medical condition, as opposed to other reasons, because the preponderance of the objective medical record lacks sufficient documentation in support of such limitations. Overall, [C]laimant's reported daily activities are considered to be outweighed by the factors discussed in this decision.

*Id.* Therefore, based on the foregoing reasons, the ALJ found "that the [C]laimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision." R. 26.

In the instant case, the ALJ adequately provided his reasons for finding Claimant not

credible. He acknowledged Claimant's alleged limitations, and he did much more than merely make a conclusory finding. The ALJ relied on the objective medical evidence, the reports from the different physicians, and the dearth of a single opinion that substantiated Claimant's alleged limitations. Thus, in light of *Skarbek*, the deference given to the ALJ, and the ample support the ALJ provided, this Court finds that the ALJ complied with the SSR-96-7p requirements and did not err in his explanation of his credibility determination.

## D.  THE ALJ DID NOT IMPROPERLY RELY ON THE VE'S TESTIMONY THAT CONFLICTED WITH THE DICTIONARY OF OCCUPATIONAL TITLES

Claimant argues that the VE's testimony conflicts with the Dictionary of Occupational Titles ("DOT") and such conflicts should have been resolved by the ALJ pursuant to SR 00-4p.  Defendant argues that the ALJ performed his duties at the hearing and is not required to reopen the record.

SSR 00-4p states that "[w]hen there is an *apparent* unresolved conflict between [the] VE ... and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the VE ... to support a determination or decision about whether the claimant is disabled."  (Emphasis added).  Clearly, the conflict between the VE and the DOT must be apparent.  Thus, the Seventh Circuit quoted SSR 00-4p and set forth its interpretation of the ruling when it stated, "This ruling requires the [ALJ] to '[e]xplain [in the] determination or decision how any conflict [with the [DOT]] that *has been identified* was resolved.'" *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) (quoting SSR 00-4p).  "The ruling requires an explanation only if the discrepancy was 'identified' - that is, if the claimant (or the alj on his behalf) noticed the conflict and asked for substantiation."  *Id.* at 446-47.

In this case, after the exchange of hypotheticals among the ALJ, the VE, and Claimant's attorney, which are set forth in detail above, Claimant's attorney asked the VE, "And the numbers you gave conform to the DOT?"  R. 281.  The VE replied, "Yes."  *Id.* Claimant's attorney then stated, "I don't think I have anything further, Your Honor."  *Id.*

Without question, no discrepancy was identified before the ALJ at the hearing.

Claimant's attorney asked the VE if his job numbers conformed to the DOT, the VE said they did, and Claimant's attorney accepted the answer and asked no more questions. However, Claimant now argues that he did what was required under *Donahue* at the hearing by asking the VE if the numbers conform to the DOT. This Court disagrees.

Here, any potential conflicts between the VE's testimony and the DOT were not identified at the hearing. Thus, notwithstanding Claimant's several assertions and examples of conflicts between the VE and the DOT, the ALJ appropriately relied on the VE's testimony. Claimant argues that it was impossible for Claimant's attorney to identify a conflict if the VE testifies, under oath, that there was no conflict. Yet, besides admitting that no conflict was identified at the hearing, Claimant's argument fails because Claimant's attorney could have asked the VE more questions about his testimony and identified any conflicts that existed. Claimant failed to do so.

*Donahue* is clear; any conflict must be identified before the ALJ. *Id.* at 446-47. Because no discrepancies were brought to the ALJ's attention, the ALJ was not required to resolve any. Only before this Court has Claimant raised the issue of conflict between the VE's testimony and the DOT, and "[r]aising a discrepancy only after the hearing ... is too late. An [ALJ] is not obliged to reopen the record. On the record as it stands - that is, with no questions asked that reveal any shortcomings in the VE's data or reasoning - the [ALJ] was entitled to reach the conclusion [he] did." *Id.* at 447. Furthermore, "[w]hen no one questions the VE's foundation or reasoning, an [ALJ] is entitled to accept the VE's conclusion, even if that conclusion differs from the [DOT's] - for the [DOT], after all, just

records other unexplained conclusions and is not even subject to cross-examination." *Id.* at 446.

**E.     CLAIMANT'S OTHER ARGUMENTS REGARDING SSR 83-10 AND THE VE'S TESTIMONY REGARDING AVAILABLE JOBS ARE ACADEMIC**

Claimant argues that the ALJ's limited range of light work RFC finding conflicts with the definitions set forth in SSR 83-10. Claimant also argues that the VE's testimony that the light jobs he identified could be performed in a seated or sit/stand fashion do not comport with an individual with hand impairments. In light of the ALJ's improper RFC finding and the incomplete hypothetical posed to the VE, however, these arguments are merely academic and will not be addressed by the Court.

# IV. CONCLUSION

The ALJ erred by misstating the ME's opinion. The ME testified that Claimant would only have handling and fingering, gross manipulation and fine dexterity, for between 1/3 and 2/3 of the day. Yet the ALJ stated that Claimant's only hand limitation was that he would have fine dexterity for 2/3 of the day. Therefore, the ALJ's RFC finding is flawed, and the ALJ posed an incomplete hypothetical to the VE and then relied on the VE's testimony. **For the reasons set forth in this opinion, Plaintiff's motion for summary judgment is granted, the Commissioner's motion for summary judgment is denied, and the matter is remanded to the ALJ for further consideration.**

**SO ORDERED THIS 18TH DAY OF MAY, 2006.**

_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies mailed to:**

Frederick J. Daley, Jr.
DALEY, DEBOFSKY & BRYANT
One North LaSalle Street, Suite 3800
Chicago, IL 60602

Counsel for Plaintiff

Mara S. Miskin
Assistant Regional Counsel
Social Security Administration
220 West Adams Street, 30th Floor
Chicago, IL 60606

Counsel for Defendant

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| **FRANK L. GREENWOOD,** | ) | |
| | ) | |
| **Plaintiff,** | ) | **Case No. 05 C 5707** |
| | ) | |
| **v.** | ) | **Magistrate Judge Morton Denlow** |
| | ) | |
| **JO ANNE B. BARNHART,** | ) | |
| **Commissioner of Social Security,** | ) | |
| | ) | |
| **Defendant.** | ) | |

## <u>MEMORANDUM OPINION AND ORDER</u>

This case comes before this Court on Plaintiff's motion for summary judgment and Defendant's motion for summary judgment. Plaintiff, Frank L. Greenwood ("Plaintiff" or "Claimant"), challenges the decision of Defendant Jo Anne B. Barnhart, Commissioner of Social Security ("Defendant" or "Commissioner"), claiming that her denial of Plaintiff's request for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI") should be reversed or remanded because the Administrative Law Judge: (1) failed to follow SSR 96-8p and his RFC finding is not supported by substantial evidence; (2) improperly found that the Claimant was not credible; (3) posed incomplete hypotheticals to the VE and thus substantial evidence does not support the ALJ's step five finding; (4) improperly relied on the VE's testimony that conflicts with the Dictionary of Occupational Titles; and (5) made a RFC finding that conflicts with SSR 83-10 and the VE's testimony regarding available jobs was improper. For the reasons stated below, this Court grants

Claimant's motion for summary judgment and denies the Commissioner's motion for summary judgment.

## I. BACKGROUND FACTS

### A. PROCEDURAL HISTORY

Claimant filed applications for DIB and SSI on March 12, 2002, alleging a disability since January 1, 2002 on account of not being able to use his right hand effectively. R. 70, 84. The applications were denied initially, R. 28, and again upon reconsideration. R. 38. On April 16, 2004, Administrative Law Judge Edward R. Gustafson ("ALJ") held a hearing on the question of disability. R. 250-83. Claimant, who was represented by counsel, testified at the hearing. R. 252-55, 257-73, 281-82. Dr. Daniel Girzadas, a medical expert , R. 254-57, 259, 273-79, 281-82, and Dr. Richard Hamersma, a vocational expert, R. 278-81, also testified.

On May 27, 2004, the ALJ issued his decision, and determined that Claimant was not disabled. R. 18-27. On August 5, 2005, the Appeals Council denied Claimant's request for review. R. 7-9.

Claimant now seeks judicial review of the Commissioner's decision pursuant to 42 U.S.C. § 405(g). The parties have consented to this Court's jurisdiction to decide this case pursuant to 28 U.S.C. § 636(c)(1). The Court conducted an oral argument on May 15, 2006.

### B. HEARING TESTIMONY - APRIL 16, 2004

### 1.    Claimant's Testimony

Claimant was 46 years old at the date of the hearing.  R. 252.  He has lived in a third-floor apartment for approximately three years. R.252-53.  Claimant has a General Education Development (GED) degree.  R. 253.  In his last job, where he was employed for about two years, Claimant installed automotive accessories such as brush guards, side bars, and car radios.  *Id.*

Claimant testified that he broke his thumb when he fell off his bicycle.  R. 253, 258.  He said he dislocated his thumb, the bone came through the skin, a cast was put on it, and it became infected causing Claimant to be hospitalized for three or four days.  R. 267.  Antibiotics cleared up the infection.  R. 270.  He said no stitches were applied to his thumb, and he put his thumb back in place; thus the emergency room treaters did not know if he had a dislocation.  R. 269-70.

Claimant stated that he could not really use his thumb, "it doesn't bend or anything, [i]t hurts constantly ... [and he] can't lift anything with it."  R. 258.  Claimant said he could not turn on a showerhead or grab anything with his right hand; he was limited to his left hand.  R. 259.  He can lift "[s]ome light things," such as a shirt or pair of pants, but nothing that he really has to "grip ... because it'll slip out."  R. 266.  He can lift maybe five or six pounds with his right hand.  *Id.*  He uses his left hand for his cane, and must do all of his lifting with his right hand when he is standing with the cane.  *Id.*  Claimant also testified that his problem was that he could not bend the last joint in his thumb; the rest of the thumb was okay and he could bend it.  R. 271.  There was no medical information in the record since

2002.  R. 281.  Claimant represented that he was scheduled for an appointment on April 27.  *Id.*  Although the ALJ left the record open for 30 days to supplement the thumb portion of the record, nothing was submitted.  R. 282.

Claimant also injured his ankle and knee when he was hit by a car and pinned between a van and a car.  R. 254, 267.  He stated that his injuries have "healed some.  [He is] still under a doctor's care.  [The doctor] may have to perform surgery [on his knee].  [The doctor] said he may have to fuse a bone or something and put some rods and screws in there."  *Id.*  Claimant used a cane at the hearing.  R. 259.  His knee has been swollen since the accident, and no one has taken any fluid out of his knee.  R. 271.  He received a shot on the side of his knee, and no one suggested that he undergo an MRI.  R. 271-72.  Claimant stated that even though the x-rays indicate the fracture is completely healed, he always uses his cane because his leg gives out sometimes.  R. 273.

Claimant was also given a knee brace by his doctor, and he daily takes Tylenol III with codein, Motrin, and Bextra.  R. 259-60.  The medications make Claimant dizzy about 13 or 14 days a month, and he must lay down for 3 or 4 hours when the dizziness occurs.  R. 260-61.  The dizziness has occurred on and off for just over a year.  R. 261.

His ankle sometimes swells, but it does not bother him as much as his left leg.  R. 265.  His left leg hurts everyday and the pain is typically a three or four out of ten, though it sometimes can be a seven or eight.  *Id.*  When the pain gets intense, he takes medicine and has to lay down until the medicine works.  *Id.*  Sometimes it takes an hour for the medicine to work, and other times he may be in bed for the day.  *Id.*

A typical day for Claimant is as follows: Claimant wakes up around 5:30 or 6:00, uses the bathroom, then sits in the tub and soaks his leg for 35 or 40 minutes. R. 262-63. He then puts his knee brace on, reads a book or watches television, and spends most of the day sitting down or laying down. R. 263. He cannot shop; his cousin does it for him. R. 262. He cannot shower because his leg sometimes gives out. *Id.* He sits with his leg straightened out; he can only sit with his knee at a 90-degree angle for about an hour. *Id.* He can only stand for approximately twenty minutes and then he must sit for some time between twenty minutes and an hour. R. 263-64. He also testified that the dizziness caused by the medication affects his ability to read. R. 263. Claimant has no difficulties sitting for long periods of time so long as he has room to keep his leg stretched out straight. R. 264. He can only walk about two blocks at one time, and it takes him about twenty minutes to get up the stairs to his third-floor apartment. *Id.*

### 2. Dr. Daniel Girzadas - Medical Expert ("ME")

Dr. Daniel Girzadas, an orthopedic specialist, testified as a medical expert at the hearing regarding Claimant's medical impairments and pain allegations. R. 252, 254-57, 259, 273-79, 281-82. The ME highlighted a note from Mount Sinai Medical Center, which stated that Plaintiff had mild degenerative changes at the proximal tibia fibular joint and that options had been discussed with Plaintiff for a possible fusion of the joint. R. 255.

Regarding the fusion procedure, the ME stated that he "went through a computer search, and the major orthopedic textbooks, and conferenced with three orthopedic surgeons, and no one's ever heard of a fusion of the proximal tibia fibular joint." R. 255. He said,

"That's an operation that we [have not] heard of, and we can't find on the Internet." R. 256.

Asked why it is not a feasible operation, the ME replied,

> Well, it's not a true joint. It's a syndesmosis.[1] In other words, it's a point at which the fibula and tibia come together and there's virtually no motion there. In fact, you can take that piece of bone and not miss it, and there's no reason to have an operation where you fuse it to the tibia. I mean it's a disposable part, if you might say, that does not have a function when you walk or you do any kind of motion, and if you take it out, the lateral collateral ligament can attach to the tibia without any difficulty. The next report in the literature – in the record there's an x-ray report ... which does not note any arthritis in that joint.

R. 256. The ME also testified that the x-ray report shows that Claimant's left knee joint has an effusion[2] and he has a healed fracture of the proximal tibia. *Id.* Therefore, the ME stated that "there might be something that's going on in his knee that's not been diagnosed, but there's nothing that's reported on the x-ray concerning the proximal tibia or the fibula." *Id.*

The ME testified that, according to the x-rays, Claimant's leg was in good alignment, it was completely healed, and there should be no impediment with reference to the tibia. R. 257. Regarding the malleolus[3], the ME stated that there was a small, chip fracture, but the cast was removed in four weeks and Claimant was full weight-bearing thereafter. *Id.* The ME saw no reason why Claimant could not perform light work. *Id.*

---

[1] A form of fibrous joint in which opposing surfaces that are relatively far apart are united by ligaments. *Steadman's Medical Dictionary* 1721 (26th ed. 1995).

[2] The escape of fluid from the blood vessels or lymphatics into the tissues or a cavity. *Steadman's Medical Dictionary* 547 (26th ed. 1995).

[3] A rounded bony prominence, such as those on either side of the ankle joint. *Steadman's Medical Dictionary* 1057 (26th ed. 1995).

The ME discussed multiple injuries to Claimant's thumb and legs that are supported by the record.  R. 273-74.  He observed that while the fractures to Claimant's tibia, fibula, and thumb have healed, Claimant has a residual of swelling of his knee.  R. 274-75.  Regarding the swelling, the ME stated that it is possible that when Claimant broke his tibia, he may have sustained cartilage damage or meniscus damage in his knee, which would account for his knee giving way and the continued swelling.  R. 276.  However, the ME said Claimant has had no diagnostic studies and there is no objective medical information to explain the knee problem.  *Id.*  The ME also stated that the swelling of his knee, or joint effusion, since the date of his injury would limit his ability to walk and stand to at least two hours a day.  R. 276-77.

Finally, the ME testified that it is possible that Claimant could have residual limitation of motion in his thumb, even though he had no evidence to substantiate such a limitation.  R. 276.  Based on the record, the ME opined that Claimant could use his right hand for handling and fingering for one-third to two-thirds of the day.  R. 277.  The ME also stated, however, that from his standpoint, there should not be pain in Claimant's thumb.  R. 282.

### 3.    Dr. Richard Hamersma - Vocational Expert ("VE")

Dr. Richard Hamersma, a VE, testified at the hearing regarding existing jobs in the economy which might be suitable for Claimant.  R.  278-281.  In response to the ALJ's hypothetical question about an individual with Claimant's age , vocational background, and a hand injury that limited his hand dexterity to fine dexterity for two-thirds of the day and without fine dexterity for the rest of the day, the VE testified that it would have an effect on

his ability to do light work. R. 278. Specifically, such limitations "would probably eliminate, just in terms of dexterity, maybe 1/3 of the jobs." *Id.* The VE opined that Claimant could perform the following light and unskilled jobs: inspector (6,500 jobs in the Chicago metropolitan area), hand packager (7,000 jobs), and assembly worker (8,000 jobs). R. 278-79. The VE then said that even if you added to the above hypothetical individual a knee injury that limits him from walking and standing in excess of two hours a day, the jobs and numbers listed above would not be affected because those jobs can be performed with a sit/stand option. R. 279. The VE further testified that the hypothetical only applied to limitations to fine dexterity, but jobs affected by limitations to gross manipulation were not included in the hypothetical. R. 280-81.

## C.   MEDICAL EVIDENCE - PHYSICAL HEALTH

### 1.   Cook County Hospital - June 2001 - March 2002

On June 22, 2001, Claimant sought emergency treatment at Cook County Hospital for an injury sustained to his thumb after falling off his bike. R. 174-75. He dislocated his thumb and was prescribed antibiotics for an infection. *Id.* Claimant was diagnosed with a right thumb infection at an examination on July 12, 2001, and prescribed Heflex and Tylenol. R. 148. X-rays taken on March 8, 2002 diagnosed Claimant with right thumb arthritis. R. 142-48. On the "Return to Work/School Verification" form completed on March, 8 2002, the physician indicated that Claimant could resume work the following day, but Claimant was restricted to working with only his left hand until he had surgery in April 2002. R. 147.

### 2.   Dr. Scott Kale - Consultative Examination - March 20, 2002

On March 20, 2002, Dr. Scott Kale ("Dr. Kale") performed an internal medicine consultative examination on Claimant.  R. 139-41.  Regarding Claimant's musculoskeletal system, Dr. Kale reported:

> Straight leg raising is negative.  Range of motion of the shoulders, elbows and wrists is normal.  The right hand grip strength is 3/5 power verses 5/5 power in the left.  There is moderate tenderness over the first carpal metacarpal joint of the right thumb.  He has lack of flexion at the DIP of the right thumb.  The range of motion of the hips, knees and ankles is normal.  The gait was non-antalgic without the use of an assistive device.

R. 140-41.  Dr. Kale's clinical impression was that Claimant had "[c]hronic tendonitis secondary to fracture of the right thumb with altered grip strength and right hand use for fine and gross manipulation."  R. 141.

### 3.    Dr. Prahlad Pyati - Mount Sinai Hospital - June 2002 - March 2004

On June 8, 2002, after being pinned between a van and a car in an automobile accident, Claimant was admitted into Mount Sinai Hospital and treated by Dr. Prahlad Pyati ("Dr. Pyati").  R. 169.  Claimant suffered a comminuted fracture of the shaft, proximal part of the left tibia and a crack fracture of the lateral malleolus on the right ankle.  *Id.*  To treat the fractures, Claimant received an external fixator[4] and a short-leg walking cast.  *Id.*  The operative report noted that Claimant "tolerated the procedure well."  *Id.*  Dr. Pyati also reported that Claimant's left knee demonstrated a large suprapatellar fluid collection, which was most likely blood associated with the comminuted fracture of the proximal tibia, but no

---

[4] A device providing rigid immobilization through external skeletal fixation by means of rods attached to pins which are placed in or through the bone.  *Steadman's Medical Dictionary* 660 (26th ed. 1995).

other noteworthy finding could be made." R. 171.

Treatment records from July 18, 2002, indicated that Claimant was "doing well," but x-rays of the tibial shaft showed that the fracture was healing slowly. R. 157. The fracture of the right ankle was healed. *Id.* The cast on the right leg was removed and an air cast was applied. *Id.* Claimant was referred to physical therapy for range of motion exercises for the right ankle and the left knee. *Id.*

On September 26, 2002, following Claimant's physical therapy, x-rays showed that Claimant's fracture of the proximal tibia was completely healed. R. 236. Dr. Pyati attempted to remove the external fixator, but the procedure was aborted, and the fixator reapplied, because Claimant could not stand the pain. *Id.* On October 4, 2002, with Claimant under general anesthesia, the leg was cleaned and the external fixator was removed without difficulty. R. 235. Clean dressings were applied and Claimant tolerated the procedure well. *Id.* On October 14, 2002, x-rays were taken and they showed that the fracture had completely healed. R. 234. However, Claimant still had some quadriceps weakness. *Id.* Therefore, he was referred to physical therapy to strengthen his quadriceps. *Id.* He was still wearing a Don Joy brace. *Id.*

On January 23, 2003, Dr. Pyati took more x-rays and stated that the x-rays showed a completely healed fracture of the tibia. R. 233. However, Claimant still complained of pain in his right ankle, which also had been fractured. *Id.* Dr. Pyati took x-rays of the right ankle and the x-rays showed a completely healed fracture of the lateral malleolus with no evidence of any non-union. *Id.* Dr. Pyati noted that Claimant "was reassured about this." *Id.*

Claimant still had some weakness in his left quadriceps, and he was advised to do some strengthening exercises. *Id.* Finally, Dr. Pyati noted that Claimant wanted to be discharged, and he had done well and was walking well, he was discharged. *Id.*

Dr. Pyati saw Claimant again on February 19, 2004. R. 231. Claimant came complaining of pain in the left proximal leg area and said the pain radiates along the lateral aspect of his leg. *Id.* Dr. Pyati reported that clinically, there was definite tenderness over the proximal tibial fibular joint, but the rest of the joint was normal. *Id.* X-rays taken showed some evidence of degenerative joint disease changes from the proximal tibial fibular joint. *Id.* Dr. Piyati instilled the joint with a mixture of 40 mg of Depo-Medrol and Xylocaine with good relief. *Id.* If the injection did not alleviate the pain, Dr. Piyati noted that she might have to fuse the joint, though she was not sure Claimant warranted such a procedure. *Id.*

On March 18, 2004, Claimant followed up with Dr. Pyati and Dr. Pyati reported that the February 19th injection helped Claimant for about two weeks. R. 229. The examination showed that there was still tenderness over the proximal tibial fibular joint, which showed mild degenerative joint disease changes. *Id.* Dr. Pyati reported that options were discussed with Claimant for possible fusion of the joint, but Claimant was not very anxious for that procedure. *Id.* Claimant wanted to have some disability forms filled out and was scheduled to be seen again in one month. *Id.*

4. **Schwab Rehabilitation Hospital and Care Network - July 2002 - September 2002**

Between July 22, 2002, and September 24, 2002, Claimant underwent physical therapy at the Schwab Rehabilitation Hospital and Care Network. R. 214-26. Claimant attended fifteen visits and made progress in increasing his strength and range of motion. *Id.* Upon discharge on September 24, 2002, Claimant was independent in community ambulation with a straight cane and had an improved heel toe gait pattern, but he still had a noticeable limp. R. 214. The limp was mostly due to Claimant's tendency to abduct his left leg when he walked to avoid the tip of the external fixator poking the medial aspect of his right knee. *Id.* The discharge assessment noted that Claimant met the goals of treatment set at the initial evaluation, with the exception that there was still a five degrees extension lag in his left knee extension. R. 215.

### 5.     Dr. Lisa Russell - Mount Sinai Hospital - April 7, 2004

On April 7, 2004, Claimant sought treatment from Dr. Lisa Russell ("Dr. Russell") because he was concerned he may have had osteomyelitis[5] in his left leg. R. 180. Dr. Russell's history and exam suggested that Claimant did not have osteomyelitis. *Id.* Lab work was ordered and Bextra, an anti-inflammatory medication, was prescribed. *Id.*

## D.     THE ALJ'S DECISION - MAY 27, 2004

After conducting the hearing and reviewing the evidence, the ALJ found that Claimant was not disabled within the meaning of the Social Security Act. R. 18-27. Although he determined that Claimant had fractures of the lower limbs and right hand complaints that were "severe" and he could not perform any past relevant work, the ALJ found that Claimant had the residual functional capacity ("RFC") to perform a limited range of light level work. R. 26.

The ALJ assessed Claimant's applications for DIB and SSI under the five-step sequential analysis. *See infra*, Part II B (describing the disability standard of review). Under step one of the disability analysis, the ALJ found that Claimant did not engage in any substantial gainful activity since his alleged onset date. R. 25-26.

Under the second step, the ALJ found that Claimant had fractures of the lower limbs and right complaints that were severe impairments. R. 26. At step three, however, the ALJ determined that Claimant's severe impairments did not meet or equal a listed impairment

---

[5] Inflammation of the bone marrow and adjacent bone. *Steadman's Medical Dictionary* 1269 (26th ed. 1995).

under the Social Security Regulations. *Id.*

At step four, the ALJ determined Claimant's RFC. The ALJ stated that even giving Claimant the benefit of the doubt as to his pain allegations, "the record lacks sufficient documentation to show that he suffers from significant functional limitations that preclude his capacity to sustain gainful employment." R. 24. In particular, the ALJ noted that "the record does not contain any opinions from treating or examining physicians indicating that [C]laimant is disabled, or even remotely has limitations that would preclude employment." *Id.* The ALJ also "considered [C]laimant's subjective complaints, as compared to objective medical findings." *Id.* The ALJ found that "[o]verall, [C]laimant's reported [limitations in his] daily activities are considered to be outweighed by the other factors discussed in this decision." The ALJ found that Claimant's alleged limitations were not totally credible. R. 26. Therefore, the ALJ determined that Claimant possessed the RFC to perform a limited range of light work. R. 25-26. The ALJ found that such limitations included performing fine dexterity for only two-thirds of the day and a reduced ability to stand or walk for only two hours in an 8-hour workday. R. 26.

Under step five, the ALJ determined that based upon his RFC, Claimant could not perform any past relevant work. R. 25-26. However, in light of the VE's testimony, the ALJ concluded that notwithstanding Claimant's exertional limitations preventing him from performing the full range of light work, there were a significant number of jobs he could perform. R. 26. Namely, there were 8,000 inspector positions, 7,000 hand packager jobs, and 8,000 assembly line positions. R. 25-26. Therefore, the ALJ concluded that Claimant

is not disabled.  R. 25-26.

## II.  LEGAL STANDARDS

### A.    STANDARD OF REVIEW

The "findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive."   42 U.S.C. § 405(g).   A decision by an administrative law judge, ("ALJ"), becomes the Commissioner's final decision if the Appeals Council denies a request for review.  *Wolfe v. Shalala,* 997 F.2d 321, 322 (7th Cir. 1993)**.** Under such circumstances, the decision reviewed by the district court is the decision of the ALJ.  *Eads v. Sec'y of the Dep't of Health & Human Servs.*, 983 F.2d 815, 816 (7th Cir. 1993).  Judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching his decision and whether there is substantial evidence in the record to support the findings.   *Lopez v. Barnhart,* 336 F.3d 535, 539 (7th Cir. 2003).   Substantial evidence is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S. 389, 401 (1971).   A mere scintilla of evidence is not enough.  *Diaz v. Chater,* 55 F.3d 300, 306 (7th Cir. 1995).  Even when there is adequate evidence in the record to support the decision, however, the findings will not be upheld if "the reasons given by the trier of fact do not build an accurate and logical bridge between the evidence and the result."  *Sarchet v. Chater,* 78 F.3d 305, 307 (7th Cir. 1996). If the Commissioner's decision lacks evidentiary support or adequate discussion of the issues, it cannot stand.  *Steele v. Barnhart,* 290 F.3d 936, 940 (7th Cir. 2002).

While a reviewing court must conduct a "critical review" of the evidence before

affirming the Commissioner's decision, *Clifford v. Apfel*, 227 F.3d 863, 869 (7th Cir. 2000), it may not re-evaluate the facts, re-weigh the evidence, or substitute its own judgment for that of the Social Security Administration. *Diaz,* 55 F.3d at 305-06. Thus, judicial review is limited to determining whether the ALJ applied the correct legal standards in reaching a decision and whether there is substantial evidence to support the findings. *Scivally v. Sullivan,* 966 F.2d 1070, 1075 (7th Cir. 1991)**.** The reviewing court may enter a judgment "affirming, modifying, or reversing the decision of the [Commissioner], with or without remanding the cause for a rehearing." 42 U.S.C. § 405(g).

## B. DISABILITY STANDARD

Disability insurance benefits, ("DIB"), are available to claimants who can establish "disability" under the terms of Title II of the Social Security Act, ("Title II"). *Brewer v. Charter*, 103 F.3d 1384, 1390 (7th Cir. 1997). Supplemental Security Income benefits, ("SSI"), are available to "disabled indigent persons" under Title XVI of the Social Security Act, ("Title XVI"). *Barnhart v. Thomas*, 540 U.S. 20, 24 (2003). Titles II and XVI of the Social Security Act employ the same definition of "disability." *Id.* That is, an individual is "disabled" if that individual has the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §§ 423(d)(1)(A); 1382c(a)(3)(A). However, a disabled individual is eligible for DIB only if that individual is under a disability. 42 U.S.C. §§ 423(a); 1382c(a). An individual is under a disability if he is unable to do his previous work and cannot, considering his age, education,

16

and work experience, partake in any gainful employment that exists in the national economy. 42 U.S.C. §§ 423(d)(2)(A); 1382c(a)(3)(B).

To make this determination, the Commissioner must employ a five step sequential analysis. 20 C.F.R. §§ 404.1520(a)-(f); 416.920(a)-(f). If the ALJ finds at any step of this process that a claimant is not disabled, the inquiry ends. *Ismahel v. Barnhart,* 212 F. Supp. 2d 865, 872 (N.D. Ill. 2002). The process is sequential; if the ALJ finds that the claimant is not disabled at any step in the process, the analysis ends. Under this process, the ALJ must inquire: (1) whether the claimant is still working; (2) whether the claimant has a severe impairment; (3) whether the claimant's impairment meets or equals a listed impairment; (4) if the claimant does not suffer from a listed impairment, whether he can perform past relevant work; and (5) whether the claimant is capable of performing any work in the national economy. *Id.*

### III. DISCUSSION

Claimant raises five issues for review: (1) whether the ALJ followed SSR 96-8p and his RFC finding is supported by substantial evidence; (2) whether the ALJ properly found that the Claimant was not credible; (3) whether the hypotheticals posed to the VE by the ALJ were incomplete and thus substantial evidence does not support the ALJ's step five finding; (4) whether the ALJ improperly relied on the VE's testimony that conflicts with the Dictionary of Occupational Titles; and (5) whether the ALJ's RFC finding conflicts with SSR 83-10 and whether the VE's testimony regarding available jobs was improper. The Court will discuss each issue in turn.

**A.    THE ALJ'S RFC FINDING IS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE AND HE DID NOT PROPERLY FOLLOW SSR 96-8P.**

RFC is an administrative assessment of what work-related activities an individual can perform notwithstanding his limitations. *Dixon v. Massanari*, 270 F.3d 1171, 1178 (7th Cir. 2001); SSR 96-8p.  When determining the claimant's RFC, the ALJ must consider both the medical and non-medical evidence in the record. *Dixon*, 270 F.3d at 1178.  "The RFC assessment must include a narrative discussion describing how the evidence supports each conclusion, citing specific medical facts ... and nonmedical evidence ...  In assessing RFC, the [ALJ] must discuss the individual's ability to perform sustained work activities in an ordinary work setting on a regular and continuing basis (i.e., 8 hours a day, for 5 days a week, or an equivalent work schedule) ... The adjudicator must also explain how any material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." SSR 96-8p (citations omitted).

Although an ALJ need not discuss every piece of evidence in a claimant's record, the ALJ may not ignore an entire line of evidence that is contrary to the ruling. *Golembiewski v. Barnhart*, 322 F.3d 912, 917 (7th Cir. 2003); *Diaz v. Chater*, 55 F.3d 300, 307 (7th Cir. 1995).  This is necessary so that a reviewing court can tell whether the ALJ's decision rests upon substantial evidence. *Golembiewski*, 55 F.3d at 307.  However, the ALJ must only minimally articulate his assessment of this line of evidence. *Rice v. Barnhart*, 384 F.3d 363, 371 (7th Cir. 2004).  After all, "[i]f a sketchy opinion assures us that the ALJ considered the important evidence, and the opinion enables us to trace the path of the ALJ's reasoning, the

ALJ has done enough." *Id.*

In this case, the ALJ misstated the ME's opinion and failed to explain the discrepancy. While the ALJ thoroughly discussed Claimant's medical evidence[6] and explicitly found that "[C]laimant retains the residual functional capacity [RFC] to perform a limited range of light level work," the ALJ's RFC finding is erroneous because he did not accurately incorporate the ME's opinion into his RFC, and thus the ALJ's RFC finding is not supported by substantial evidence.

The ALJ discussed the ME's testimony in his decision. The ALJ wrote that "[a]lthough there is no objective evidence of a thumb problem, the orthopedist expert present at the hearing, Dr. Girzadas [the ME], reduced [C]laimant's [RFC] allowing fine dexterity only 2/3 of a day. Additionally, because of knee swelling, [the ME] reduced walking and standing to 2 hours." R. 25. Then, in his RFC determination, the ALJ appears to adopt the

---

[6] The ALJ stated that the "record reflects that the [knee] surgery was generally successful in relieving his symptoms." R. 24. Next, the ALJ noted that "x-rays, subsequent to surgery, showed completely healed fractures." *Id.* (citations omitted). Thus, the ALJ wrote that "[e]ven giving [C]laimant the benefit of the doubt as to mild residuals of pain resulting from his alleged impairments, the record lacks sufficient documentation to show that he suffers from significant functional limitations that preclude his capacity to sustain gainful employment." R. 24. Furthermore, the ALJ pointed out that "the record does not contain any opinions from treating or examining physicians indicating that [C]laimant is disabled, or even remotely has limitations that would preclude employment." *Id.* The ALJ further stated that Claimant's "allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if [C]laimant's are truly as limited as alleged, it is difficult to attribute that degree of limitation to his medical condition, as opposed to other reasons, because the preponderance of the objective medical record lacks sufficient documentation in support of such limitations." *Id.*

ME's opinion and recite it as his RFC finding. R. 26. However, the ME's testimony differs from the ALJ's representation of it.

Regarding Claimant's hand limitations, the ME opined that "his *handling and fingering* would be occasional on the right hand ... [b]etween *1/3 and 2/3* of the day." R. 277 (emphasis added). The ALJ, however, stated that the ME "reduced [C]laimant's [RFC] allowing fine dexterity only 2/3 of a day." R. 25. Then, in his RFC finding, the ALJ stated that Claimant could perform a limited range of light level work and "[h]e is limited to performing fine dexterity for only 2/3 of the day, and his walking and standing abilities are reduced to 2 hours in an 8-hour workday." The ALJ failed to include the ME's opinion regarding Claimant's reduced "handling" abilities, and the ALJ did not include the ME's opinion that Claimant's dexterity might only be functional for 1/3 of the day.

"Handling" is "gross manipulation" and "fingering" is "fine dexterity." *See Medina v. Barnhart*, No. 03 Civ. 0079, 2004 WL 487310, at *3 (S.D.N.Y. Mar. 11, 2004) ("Finally, he indicated that she could occasionally use her hands for repetitive actions such as handling (gross manipulation), fingering (fine manipulation), and pushing and pulling."); *see also Carson v. Barnhart*, 242 F.Supp.2d 33, 38 (D. Me. 2002) (stating that handling is gross manipulation). The *Selected Characteristics of Occupations Defined in the Revised Dictionary of Occupational Titles* defines "handling" as "[s]eizing, holding, grasping, turning, or otherwise working with hand or hands. Fingers are involved only to the extent that they are an extension of the hand, such as to turn a switch or shift automobile gears." SCODICOT APP C.9. It defines "fingering" as "[p]icking, pinching, or otherwise working

primarily with fingers rather than with the whole hand or arm as in handling." *Id.* at C.10. Handling and fingering do not both fall under the category of "fine dexterity." Therefore, the ALJ failed to take into account the ME's opinion that Claimant's gross manipulation as well as his fine dexterity would be occasional. The ALJ also failed to consider that Claimant's limitations might exist for between 1/3 and 2/3 of the day.

SSR 96-8p states that "[t]he RFC assessment must always consider and address medical source opinions. If the RFC assessment conflicts with an opinion from a medical source, the adjudicator must explain why the opinion was not adopted." Thus, even if the ALJ chose not to follow the ME's opinion, he would have to explain why he was rejecting it. "[T]he ALJ is precluded from substituting his own judgement for that of the medical expert." *Hampton v. Massanari*, 171 F.Supp.2d 791, 795-96 (N.D. Ill. 2001) (citing *Rohan v. Chater*, 98 F.3d 966, 970 (7th Cir.1996)). Here, however, it appears that the ALJ simply misstated the ME's opinion[7] and then relied on that erroneous statement in his RFC finding. Therefore, the ALJ's RFC finding is flawed and not supported by substantial evidence.

**B.**     **THE ALJ ERRED BY POSING AN INCOMPLETE HYPOTHETICAL TO THE VE**

Claimant argues that the ALJ's step five finding was not supported by substantial evidence because the hypotheticals posed to the VE were incomplete. Defendant disagrees

---

[7] The ALJ also misrepresented some of the VE's testimony in his decision. The VE testified that there were 6,500 inspector jobs available in the Chicago metropolitan area. R. 279. In his decision, however, the ALJ stated that the VE testified that there were 8,000 inspector jobs. R. 25.

and argues that the hypotheticals asked to the VE incorporated all of the record evidence.

When posing a hypothetical question to the VE, the ALJ "must fully set forth the claimant's impairments to the extent that they are supported by the medical evidence in the record." *Herron v. Shalala*, 19 F.3d 329, 337 (7th Cir. 1994). The hypothetical must also include "all limitations supported by medical evidence in the record." *Steele v. Barnhart*, 290 F.3d 936, 942 (7th Cir. 2002). However, an exception "exists for cases in which the [VE] independently learned of the limitations (through other questioning at the hearing or outside review of the medical records, for example) and presumably accounted for them." *Id.*

In this case, regarding Claimant's hand limitations, the ME testified that "his handling and fingering would be occasional on the right hand ... [b]etween 1/3 and 2/3 of the day." R. 277. Then, in the ALJ's first hypothetical to the VE, the ALJ asked the VE to assume an individual limited to fine dexterity "2/3 of the day," not between 1/3 and 2/3 as the ME stated, and without the fine dexterity for the other 1/3 of the day. R. 278. The VE said such a limitation would eliminate 1/3 of the jobs available. *Id.* Next, Claimant's attorney tried to clarify the hypothetical for the VE by asking, "if we changed your hypothetical to include [the ME] [so that] his difficulties in bimanual manipulation/fingering would be 1/3 to 2/3 of the day ... you're including that in the hypothetical?" R. 280. The VE answered, "Yes ... the [ALJ] was asking me the total number of jobs giving this. I would say ... this ... at the light level would probably eliminate [one] third of those jobs." *Id.* The VE continued, "This hypothetical only applied to fine dexterity. The [job] numbers I gave do not apply to fine

22

objects. It's just gross manipulation, which was not limited." R. 280-81. The ALJ then tried to clarify, "In other words, the hand - - the inspection jobs, the hand packaging jobs, the assembly jobs only require gross dexterity?" R. 281. The VE answered, "Yes."

In the instant case, the ALJ failed to pose a hypothetical to the VE that incorporated Claimant's limitations with gross manipulation. The ME opined that Claimant's "handling and fingering" would be occasional for 1/3 to 2/3 of the day. While Claimant's attorney clarified the temporal aspect of the limitation, no one constrained the hypothetical to limitations with both gross manipulation and fine dexterity. As explained in detail in Part III.A. above, "handling" is "gross manipulation" and "fingering" is "fine dexterity." As expressly stated by the VE, his testimony about available jobs for Claimant dealt only with his fine dexterity limitation, not with his gross manipulation limitation. Therefore, the ALJ erred by posing an incomplete hypothetical to the VE, and because the VE expressly stated that his answers did not take into account gross manipulation, the exception for a VE's independent ascertainment of all limitations does not apply.

At oral argument, the Commissioner submitted a section of the DOT to the Court and argued that even if the ALJ's hypothetical was incomplete, it was harmless error because gross manipulation and fine dexterity are required for only 1/3 to 2/3 of the day for the jobs recommended by the VE. However, in light of the numerous components that factor into each occupation under the DOT, the fact that Claimant also has walking and standing limitations in addition to his hand limitations, and the reality that occupational availability is the VE's expertise and not the Court's, the Court finds that the case should be remanded

23

so a VE can properly opine, based on an accurate representation of Claimant's limitations, what jobs, if any, are available for Claimant in the national economy.

## C.    THE ALJ PROPERLY FOUND CLAIMANT NOT TOTALLY CREDIBLE

Claimant next argues that the ALJ made an improper credibility finding and disregarded SSR 96-7p and 20 C.F.R.§ 404.1529 when he found Claimant's testimony "not totally credible." R. 26. Claimant asserts that the ALJ failed to give specific reasons supported by the evidence in the record for his credibility finding, but instead he merely stated that Claimant's reported daily activities were "considered to be outweighed by the other factors discussed in the decision." R. 24. Defendant argues that the ALJ engaged in a thorough analysis of Claimant's credibility and cited several pertinent factors as the basis for his finding.

The ALJ is afforded special deference in his credibility determinations because he is in the best position to see and hear the claimant and assess her forthrightness. *Powers v. Apfel*, 207 F.3d 431, 435 (7th Cir. 2000). Therefore, an ALJ's credibility determination will only be reversed if the claimant can show it was "patently wrong." *Id.* Pursuant to SSR 96-7p, however, the ALJ must give specific reasons for his credibility finding and cannot merely make a conclusory statement that the claimant's allegations have been considered and they are or are not credible. *Zurawski v. Halter*, 245 F.3d 881, 887 (7th Cir. 2001). Thus, the ALJ's credibility determination will be affirmed "as long as the ALJ gives specific reasons that are supported by the record for his finding." *Skarbek v. Barnhart*, 390 F.3d 500, 505 (7th Cir. 2004).

In *Skarbek*, the ALJ determined that the claimant was not credible regarding his limitations. 390 F.3d at 505. The ALJ gave only two reasons for his findings.[8] *Id.* The Seventh Circuit, however, found that the ALJ complied with SSR 96-7p's requirement that he give specific reasons for his findings even he though he only provided two reasons. *Id.*

In this case, the ALJ gave several reasons and provided sufficient support for his credibility finding. First, the ALJ noted that he "acknowledge[d] the fact that [C]laimant has experienced some pain residuals with regard to his knee and thumb complaints. In fact, the evidence does show that [C]laimant did undergo surgery for his knee impairment - which certainly suggests that his symptoms are genuine." R. 24. However, the ALJ then stated, "while that fact would normally weigh in [C]laimant's favor, it is offset by the fact that the record reflects that the surgery was generally successful in relieving his symptoms." *Id.* Next, the ALJ describes how Claimant completed the recommended fifteen physical therapy visits and examiners reported that except for a five-degree extension lag in his left knee extension, Claimant met the treatment goals set forth at the initial evaluation. *Id.* In addition, the ALJ noted that x-rays taken after Claimant's surgery showed completely healed fractures. *Id.*

---

[8] "First, the ALJ stated that Skarbek's testimony of constant throbbing pain was not consistent with the findings of the specialists or with Skarbek's medical records. Second, the ALJ stated that Skarbek's testimony regarding his daily activities--that, among other things, he drove, did laundry and household chores, and was able to cut grass on occasion--did not support a finding that he was totally disabled. The ALJ found that Skarbek's abilities and activities were more consistent with the opinions of Dr. Yergler and Dr. Graham than with his own testimony." *Skarbek*, 390 F.3d at 505.

Furthermore, the ALJ expressly stated that "[e]ven giving [C]laimant the benefit of the doubt as to mild residuals of pain resulting from his alleged impairments, the record lacks sufficient documentation to show that he suffers from significant functional limitations that preclude his capacity to sustain gainful employment." R. 24. The ALJ also noted that "the record does not contain any opinions from treating or examining physicians indicating that [C]laimant is disabled, or even remotely has limitations that would preclude employment." *Id.*

Next, the ALJ set forth the myriad limitations Claimant alleged due to his pain and weakness, and the ALJ stated that he had "considered [C]laimant's subjective complaints, as compared to objective medical findings." *Id.* The ALJ then stated:

> Although [C]laimant has described daily activities which are fairly limited, two factors weigh against considering these allegations to be strong evidence in favor of finding him disabled. First, allegedly limited daily activities cannot be objectively verified with any reasonable degree of certainty. Secondly, even if [C]laimant's are truly as limited as alleged, it is difficult to attribute that degree of limitation to his medical condition, as opposed to other reasons, because the preponderance of the objective medical record lacks sufficient documentation in support of such limitations. Overall, [C]laimant's reported daily activities are considered to be outweighed by the factors discussed in this decision.

*Id.* Therefore, based on the foregoing reasons, the ALJ found "that the [C]laimant's allegations regarding his limitations are not totally credible for the reasons set forth in the body of the decision." R. 26.

In the instant case, the ALJ adequately provided his reasons for finding Claimant not

credible.  He acknowledged Claimant's alleged limitations, and he did much more than merely make a conclusory finding.  The ALJ relied on the objective medical evidence, the reports from the different physicians, and the dearth of a single opinion that substantiated Claimant's alleged limitations.  Thus, in light of *Skarbek*, the deference given to the ALJ, and the ample support the ALJ provided, this Court finds that the ALJ complied with the SSR-96-7p requirements and did not err in his explanation of his credibility determination.

**D.    THE ALJ DID NOT IMPROPERLY RELY ON THE VE'S TESTIMONY THAT CONFLICTED WITH THE DICTIONARY OF OCCUPATIONAL TITLES**

Claimant argues that the VE's testimony conflicts with the Dictionary of Occupational Titles ("DOT") and such conflicts should have been resolved by the ALJ pursuant to SR 00-4p.  Defendant argues that the ALJ performed his duties at the hearing and is not required to reopen the record.

SSR 00-4p states that "[w]hen there is an *apparent* unresolved conflict between [the] VE ... and the DOT, the [ALJ] must elicit a reasonable explanation for the conflict before relying on the VE ... to support a determination or decision about whether the claimant is disabled."  (Emphasis added).  Clearly, the conflict between the VE and the DOT must be apparent.  Thus, the Seventh Circuit quoted SSR 00-4p and set forth its interpretation of the ruling when it stated, "This ruling requires the [ALJ] to '[e]xplain [in the] determination or decision how any conflict [with the [DOT]] that *has been identified* was resolved.'" *Donahue v. Barnhart*, 279 F.3d 441, 446 (7th Cir. 2002) (quoting SSR 00-4p).  "The ruling requires an explanation only if the discrepancy was 'identified' - that is, if the claimant (or the alj on his behalf) noticed the conflict and asked for substantiation."  *Id.* at 446-47.

In this case, after the exchange of hypotheticals among the ALJ, the VE, and Claimant's attorney, which are set forth in detail above, Claimant's attorney asked the VE, "And the numbers you gave conform to the DOT?"  R. 281.  The VE replied, "Yes."  *Id.* Claimant's attorney then stated, "I don't think I have anything further, Your Honor."  *Id.*

Without question, no discrepancy was identified before the ALJ at the hearing.

Claimant's attorney asked the VE if his job numbers conformed to the DOT, the VE said they did, and Claimant's attorney accepted the answer and asked no more questions. However, Claimant now argues that he did what was required under *Donahue* at the hearing by asking the VE if the numbers conform to the DOT. This Court disagrees.

Here, any potential conflicts between the VE's testimony and the DOT were not identified at the hearing. Thus, notwithstanding Claimant's several assertions and examples of conflicts between the VE and the DOT, the ALJ appropriately relied on the VE's testimony. Claimant argues that it was impossible for Claimant's attorney to identify a conflict if the VE testifies, under oath, that there was no conflict. Yet, besides admitting that no conflict was identified at the hearing, Claimant's argument fails because Claimant's attorney could have asked the VE more questions about his testimony and identified any conflicts that existed. Claimant failed to do so.

*Donahue* is clear; any conflict must be identified before the ALJ. *Id.* at 446-47. Because no discrepancies were brought to the ALJ's attention, the ALJ was not required to resolve any. Only before this Court has Claimant raised the issue of conflict between the VE's testimony and the DOT, and "[r]aising a discrepancy only after the hearing ... is too late. An [ALJ] is not obliged to reopen the record. On the record as it stands - that is, with no questions asked that reveal any shortcomings in the VE's data or reasoning - the [ALJ] was entitled to reach the conclusion [he] did." *Id.* at 447. Furthermore, "[w]hen no one questions the VE's foundation or reasoning, an [ALJ] is entitled to accept the VE's conclusion, even if that conclusion differs from the [DOT's] - for the [DOT], after all, just

records other unexplained conclusions and is not even subject to cross-examination." *Id.* at 446.

**E.    CLAIMANT'S OTHER ARGUMENTS REGARDING SSR 83-10 AND THE VE'S TESTIMONY REGARDING AVAILABLE JOBS ARE ACADEMIC**

Claimant argues that the ALJ's limited range of light work RFC finding conflicts with the definitions set forth in SSR 83-10.  Claimant also argues that the VE's testimony that the light jobs he identified could be performed in a seated or sit/stand fashion do not comport with an individual with hand impairments.  In light of the ALJ's improper RFC finding and the incomplete hypothetical posed to the VE, however, these arguments are merely academic and will not be addressed by the Court.

## IV. CONCLUSION

The ALJ erred by misstating the ME's opinion. The ME testified that Claimant would only have handling and fingering, gross manipulation and fine dexterity, for between 1/3 and 2/3 of the day. Yet the ALJ stated that Claimant's only hand limitation was that he would have fine dexterity for 2/3 of the day. Therefore, the ALJ's RFC finding is flawed, and the ALJ posed an incomplete hypothetical to the VE and then relied on the VE's testimony. **For the reasons set forth in this opinion, Plaintiff's motion for summary judgment is granted, the Commissioner's motion for summary judgment is denied, and the matter is remanded to the ALJ for further consideration.**

**SO ORDERED THIS 18TH DAY OF MAY, 2006.**

_____
**MORTON DENLOW**
**UNITED STATES MAGISTRATE JUDGE**

**Copies mailed to:**

Frederick J. Daley, Jr.
DALEY, DEBOFSKY & BRYANT
One North LaSalle Street, Suite 3800
Chicago, IL 60602

Counsel for Plaintiff

Mara S. Miskin
Assistant Regional Counsel
Social Security Administration
220 West Adams Street, 30th Floor
Chicago, IL 60606

Counsel for Defendant